288 P.2d 652

### In the Matter of the ESTATE of William H. KOSHMAN, Deceased.

#### No. 8275.

Supreme Court of Idaho.

Oct. 4, 1955.

Daniel A. Quinlan, Lewiston, Charles L. Powell, Kenneth E. Serier, Kennewick, Wash., for respondent.

J. H. Felton, William J. Jones, Lewiston, G. Kent Burson, Pasco, Wash., for appellant.

98

TAYLOR, Chief Justice.

William H. Koshman, Sr., died December 30, 1953, at Richland, Washington, where he had been employed for a number of years by General Electric as a patrolman. After services at Kennewick, Washington, burial took place at Lewiston, Idaho. Respondent, decedent's son, claiming to be sole heir, filed a petition for probate in Benton County, Washington, January 21, 1954, and letters were issued to him. January 29, 1954, appellant, claiming to be the widow of deceased, filed a petition for probate in Nez Perce County, Idaho, praying that letters be issued to her. Objections were filed by respondent. After hearing, the probate court granted the petition and ordered letters issued to appellant. Respondent appealed to the district court. After a trial de novo, the district court reversed the probate court and appellant brought the case here.

Appellant's claim is based upon an alleged common law marriage, which she said she and deceased entered into September 20, 1952. She had been married to one Charest (father of her two sons) from whom she was divorced. She married one Pemberton in 1939 or 1940, and divorced him after about eight months. She married one Hewitt in the fall of 1950, separated from him in the spring of 1951, and divorced him September 10, 1952. Appellant and deceased had been friends during all of these years and, except during the periods when she was living with the husbands mentioned, she kept company with deceased. They went to dances and other places together and he was a frequent caller at her home. Deceased had been living at Lewiston, operating as a dealer in second-hand and scrap goods. After he went to Richland he continued to maintain a rented building on G Street in Lewiston, where he kept a supply of such materials and in which he had a room furnished for sleeping quarters. While an employee at Richland, it was his practice to come to Lewiston once a month and spend three or four days on his "long change." These lay-off periods were occasioned by the monthly change of shifts at his place of employment. On these occasions he usually came to Lewiston on Saturday and returned to Richland the following Tuesday.

Appellant, her sons, and daughter-in-law, testified that upon the agreement of marriage he moved his personal belongings into her home and thereafter spent his leave periods there, living, eating and sleeping

with appellant, and that he bought her clothes and groceries and generally supported her. A neighbor, Hasenoehrl, testified that on one of these visits appellant introduced deceased as her husband, and that he brought his washing there. Witness Choate testified deceased at one time told him, "he came up to see his wife." Witness McNicholas testified he at one time referred to her as his "Missus." Mr. and Mrs. Paffile testified deceased came with appellant to look at a house they had for sale, and that deceased said he would talk it over with the woman who was with him.

Mrs. Cromer, a tenant in one of appellant's apartments, testified appellant introduced deceased as her husband, but she could not say they were living together. H. E. Maughan, who lived in one of her apartments from May to August, 1953, testified that on his visits the deceased lived with appellant and referred to her as "the Missus."

Witness Hammack, clerk in a diamond shop, testified that appellant came in, in the spring of 1953, with a "big man," who bought her a zircon ring. Witness Shawley testified he had known deceased and appellant for a number of years and that they had been "going together" most of that time; that in the fall of 1952 deceased told him they were married.

Mr. O'Coyne, nephew of appellant, and his wife testified that they met appellant and deceased in Coeur d'Alene in the spring of 1953 and were told by the couple that they were married, and that they visited, stayed overnight and slept together in the witnesses' home in Murray, Idaho, in the fall of 1953. Leslie Mitson and his wife, the latter being a great-niece of appellant, testified that deceased and appellant visited them in Coeur d'Alene in the spring of 1953 and in October, 1953; that she called him "My Bill" or "Billy." Marriage was not mentioned, nor were any introductions made. Mrs. Bertsch, operator of Bert's Cabin Camp at Coeur d'Alene, testified that deceased and appellant registered at her place May 2, 1953; that appellant signed the register, "Mr. & Mrs. W. H. Koshman [address] Moscow."

Mrs. Hill testified that the deceased registered at the Desert Hotel in Coeur d'Alene, October 8, 1953, accompanied by appellant, and that he wrote on the registration card, "W. H. Koshman & wife, 122 fetch, Wash.", no city being named; that the space for address on the hotel's "reference sheet" was left blank until after Koshman's death, when, at the request of appellant, a girl in the office entered therein, "Lewiston, Ida."

While George Weninger, manager of the Moscow Hotel, was on the witness stand, a registration card was produced, purporting to show a registration at that hotel by the deceased as, "W. Koshman & Wife", July 28, 1953. No address was given and the witness had been unable to find the

name "Koshman" in the guest records of the hotel.

Lillian McElvane produced the register of the St. Clair Hotel in Spokane and testified that the deceased and appellant registered and stayed at that hotel October 10, 1953, the registration being made by appellant as "Mrs. & Mr. B. Koshman, Lewiston." State not given.

On behalf of respondent, witness Varvel of Richland, testified that on the occasion of the funeral arrangements in the home of respondent, appellant was introduced to him as Mrs. Charest, and that she told him she was an old friend of the family from Lewiston. Mueller, the undertaker at Kennewick, testified that the information, entered by him on the funeral arrangement sheet, was given him by respondent in the presence of appellant; that deceased was there entered as a "divorced" person; that appellant was not listed as a relative; that she said she was not "of the family."

Mrs. Harold Coder testified that she canvassed the city of Lewiston in the summer of 1953, obtaining information for the city directory; that at appellant's residence her inquiries were answered by a lady of appellant's appearance; that pursuant to information given she was listed as a widow under the name of Charest.

Mrs. Fix had known deceased and appellant for a number of years, had met them at dances in Clarkston. She testified that about two days after the funeral she said to appellant, "You should have married him instead of Hewitt", to which appellant replied, "Well, I lived here and he lived down there, and his son lives there, and he thought more of his son than he did me, so we never got married."

Clara Beaudry testified that deceased brought appellant to the home of the witness' sister at Uniontown in September, 1952, and left her there, after proposing a date with the witness; that appellant told her on that occasion she was going by the name of Charest, not Hewitt, having decided to take the name of her children.

Raymond Butler, of the employment security agency at Lewiston, produced pre-interview reports of that agency for the months of July, August, and October, 1953, which were filled out by appellant in her own hand and in which she answered the question, "Are you married?" with the word, "No", and her purpose for desiring employment, "To support myself." These reports she signed, "Christina pemberton." Elmer McDonald, also of the employment security agency, testified appellant came in after Koshman's death and asked to see her file; said "she would like to see how she had filled them out." Referring to the answer, "No" to the question, "Are you married", she said, "That isn't right", and proposed to change the answer. Thereupon, the witness took the forms from her and explained that would do no good since the originals were already in Boise.

Ruth Calvert, secretary of the Eagles auxiliary, testified appellant became a member August 1, 1951, under the name of Hewitt, and paid dues under that name up to November 4, 1953, and that she came in and had her name changed on the records to "Koshman" early in 1954; that the telephone number which she gave was listed in the directory under the name of Christina Charest, and that there was no Koshman in the directory.

Lillian Purviance, a niece of deceased, testified she had had a conversation with appellant just before Christmas in 1953, in which appellant told her Bill had been over and had taken her to Moscow and had complained all the way back about the cost. After his death appellant 'phoned the witness of the occurrence and in response to the witness' expression of regret that her uncle had not married and had some one to take care of him, appellant said, "Lillian you know that wasn't his wish."

Through witness Wise, county auditor of Benton County, Washington, it was shown that deceased had registered and voted in that county in 1952, and in his oath had asserted residence in that state and county three years and in the precinct two years. E. F. Charette, superintendent of personnel for General Electric at Richland, produced the employer's records which showed that in 1952 and 1953 the deceased, for withholding tax purposes, had claimed only one exemption; and the employee's iden-tification certificate, dated October 25, 1950, in which the deceased over his signature had given Richland, Washington, as his home and mailing address.

Walter Koshman, brother of the deceased, testified he saw appellant sign the "Register of Friends" in the funeral home as "Christina Charest"; that on the occasion of the services at Lewiston he stayed at her home overnight and was at her house during the day on two or three days; that she then told him "if he [deceased] had married that he would be still living. She said that he didn't want to get married and when you talked marriage to him he would get mad, and he got mad once and walked right out, and he told her if she wanted to get married there was plenty of men and why didn't she get married; so she says that made her kind of feel bad, and she figured she was going to show him that she could get married, so she got married." This and other witnesses also testified that after the death of Koshman there was still bedding (on the bed), suitcase, cooking utensils, and other personal belongings in the room he maintained on G Street in Lewiston.

Lester Haynes, assistant post master at Lewiston, testified that in January or February, 1954, appellant came to the post office and inquired as to the postal savings of the deceased and referred to him as "her very dear friend." Grace Matlock, a neighbor, testified she knew appellant as Mrs. Hewitt and had never heard the name

"Koshman" applied to her until the trial. Walter Wendland, a minister at Richland, testified that on the occasion of the funeral arrangements, he met a woman who called herself "Mrs. Charest", and that she was introduced to him as a friend of the family. Harry Wickersham, who was also employed at Richland, and living at Clarkston, testified the deceased frequently came to Lewiston with him on the "long change"; that he occasionally picked him up for the return trip at his place on G Street and that "he used to make statements that he never would marry."

Respondent's wife testified that in 1952 appellant told her of her pending divorce from Hewitt and that "she didn't think she would ever get married again"; and referring to deceased, appellant said, "No, Bill has been a bachelor too many years; he is too set in his ways to ever want to get married." She further testified that she and her husband stayed at appellant's home July 18 to 20, 1953, and slept in appellant's bedroom, and that there were no men's clothing or effects there or in the closet.

Respondent's evidence also shows that the deceased was issued a certificate of title to his automobile by the state of Washington as a resident of Richland; and that he had applied for and was issued a driver's license by the state of Washington.

In rebuttal appellant denied the statements and acts attributed to her by respondent's witnesses.

The trial court found that at the time of his death the decedent was a resident of the state of Washington, and that the appellant "was never married to him, and that she was not related to him by blood, affinity, consanguinity or by operation of law, and the existence of a common law marriage between William H. Koshman, Sr. and Christina Charest was not established, and the petitioner has failed to establish a prima facie marriage to William H. Koshman, Sr., and she is not entitled to have letters of administration issued to her in this estate", and that the respondent is the son and only heir of the deceased. These findings are assigned as error.

█ It is quite clear from the evidence that the deceased had established his legal residence at Richland, Washington. There was no error in the finding of that fact.

█ The assignment of the finding that "the petitioner has failed to establish a prima facie marriage" raises only a technical objection to the wording of the court's findings. It does appear that at the close of her evidence the appellant had established a prima facie case of marriage by consent and consummation under sections 32-201 and 32-203, I.C. However, the controlling and ultimate finding is that she was never married to decedent. On this

the evidence is conflicting. There being ample competent evidence to support the finding, this court will not upset it. Holland v. Beames, 71 Idaho 343, 231 P.2d 741; Williams v. Idaho Potato Starch Co., 73 Idaho 13, 245 P.2d 1045; § 13–219, I.C.

In support of the claimed marriage, appellant cites, among other authorities, the following: Huff v. Huff, 20 Idaho 450, 118 P. 1080; Mauldin v. Sunshine Mining Co., 61 Idaho 9, 97 P.2d 608; Nicholas v. Idaho Power Co., 63 Idaho 675, 125 P.2d 321; Morrison v. Sunshine Mining Co., 64 Idaho 6, 127 P.2d 766; Thomey v. Thomey, 67 Idaho 393, 181 P.2d 777; Warner v. Warner, 76 Idaho 399, 283 P.2d 931; In re Foster (Foster v. Diehl Lumber Co.), 77 Idaho ——, 287 P.2d 282. We find nothing in those opinions contrary to the conclusion reached here. Perhaps the most comparable, from the standpoint of facts, is the case of Foster v. Diehl Lumber Co., supra. Absent here is the living together, the holding out to the public, and the general acceptance in the community, of the relationship of husband and wife, which appeared in that case. The public relationship between these parties appeared to be that of friends or sweethearts, and their cohabiting, to an extent, furtive.

Judgment affirmed. Costs to respondent.

PORTER and SMITH, JJ., concur, and KEETON and ANDERSON, JJ., concur in the conclusion.