654 P.2d 1377

In the CASE OF Carroll GRAHAM (Deceased).

Margaret A. GRAHAM & Margaret A. Graham on Behalf of Gina Sanborn & Richard Sanborn, Claimants-Appellants,

and

Shirley J. Graham on Behalf of Kelly Jo Graham & Shelly Rae Graham, Claimants-Respondents,

v.

LARRY DONOHOE LOGGING, Employer & Alaska Pacific Assurance Co., Surety, Defendants-Respondents.

No. 13836.

Supreme Court of Idaho.

Nov. 24, 1982.

Thomas A. Mitchell, Coeur d'Alene, for claimants-appellants, Margaret A. Graham, et al.

Ryan Peter Armbruster, Boise, for defendants-respondents, Larry Donohoe Logging, et al.

Herbert Nagel, Coeur d'Alene, for claimants-respondents, Shirley J. Graham, et al.

DONALDSON, Justice.

A hearing was held before a member of the Industrial Commission concerning claims arising out of the death of Carroll Graham which occurred during the course of his employment. Conflicting evidence was presented at the hearing concerning the existence or nonexistence of a common-law marriage between the decedent and Margaret A. Sanborn (Graham). In April 1978, before their divorces from others were final, the decedent and Margaret A. Sanborn (Graham) began living together. This arrangement continued, after their divorces became final, until decedent's death on October 16, 1978. On February 13, 1980, the commissioner who conducted the hearing filed his memorandum decision in which he found that there existed a common-law marriage between the decedent and Marga-

ret A. Sanborn (Graham). Later, however, the same commissioner after requesting and receiving from the parties proposed findings of fact, conclusions of law, and orders entered his findings of fact, conclusions of law and order in which he concluded that the evidence failed to establish a common-law marriage. The commissioner held that

"[t]he evidence in this matter is not sufficient to establish a mutual consent to establish a common-law marriage followed by a mutual assumption of marital rights, duties or obligations. The record only established consent and assumption of marital rights by Decedent; Claimant [Margaret A. Sanborn (Graham)] held herself out as a single person. Therefore, Claimant is not entitled to benefits under the Workmen's Compensation Law as a widow of Decedent."

The Industrial Commission reviewed the record and confirmed, approved and adopted the Findings of Fact, Conclusions of Law and Order of the commissioner as the Decision and Order of the Commission. Margaret A. Sanborn (Graham) and her two children were denied benefits. A motion for reconsideration or alternatively for rehearing was made before the Commission which was denied. Margaret A. Sanborn (Graham) on her own behalf and that of her two children appeals.

The principal issue on appeal is whether there exists substantial, competent evidence to support the finding by the Industrial Commission that there was no common-law marriage between the claimant Margaret A. Sanborn (Graham) and the decedent.

Appellate review of findings of fact made by the Industrial Commission is limited in scope. Idaho Const. art. 5, § 9; I.C. §§ 72–724, –732; *Gordon v. West,* 103 Idaho 100, 103, 645 P.2d 334, 337 (1982); *Curtis v. Shoshone County Sheriff's Office,* 102 Idaho 300, 303, 629 P.2d 696, 699 (1981); *Sykes v. C.P. Clare & Co.,* 100 Idaho 761, 605 P.2d 939 (1980); *Paulson v. Idaho Forest Industries, Inc.,* 99 Idaho 896, 591 P.2d 143 (1979). This review does not entail a de novo determination of fact. I.C. § 72–732. We are not concerned with whether this

Court would have reached the same conclusion, but rather, with whether the findings by the Commission are supported by substantial, competent evidence. Idaho Const. art. 5, § 9; I.C. § 72–732(1); *Curtis v. Shoshone County Sheriff's Office, supra,* 102 Idaho at 303, 629 P.2d at 699; *Hamby v. J.R. Simplot Co.,* 94 Idaho 794, 797, 498 P.2d 1267, 1270 (1972) (review of Industrial Accident Board finding of no common-law marriage). "This Court only has the authority to reverse a decision of the Commission when its decisions are unsupported by 'any substantial competent evidence,' I.C. § 72–732(1), or are not supportable as a matter of law, Idaho Constitution, Art. 5, § 9." *Curtis v. Shoshone County Sheriff's Office, supra,* at 303, 629 P.2d at 699.

This case presents conflicting evidence on the issue of the existence or nonexistence of a common-law marriage. We continue to recognize the Industrial Commission as the arbiter of conflicting evidence, *Hamby v. J.R. Simplot Co., supra,* and the weight to be accorded evidence is within their particular province, *Murray v. Hecla Mining Co.,* 98 Idaho 688, 571 P.2d 334 (1977); *Gradwohl v. J.R. Simplot Co.,* 96 Idaho 655, 534 P.2d 775 (1975).

The doctrine of common-law marriage has been considered by this Court on numerous occasions. *E.g., Metropolitan Life Insurance Co. v. Johnson,* 103 Idaho 122, 645 P.2d 356 (1982); *Hamby v. J.R. Simplot Co.,* 94 Idaho 794, 498 P.2d 1267 (1972); *In re Brock's Estate,* 94 Idaho 111, 482 P.2d 86 (1971); *In re Gholson's Estate,* 83 Idaho 270, 361 P.2d 791 (1961); *In re Duncan,* 83 Idaho 254, 360 P.2d 987 (1961); *Strand v. Despain,* 79 Idaho 304, 316 P.2d 262 (1957); *In re Koshman's Estate,* 77 Idaho 96, 288 P.2d 652 (1955); *In re Foster,* 77 Idaho 26, 287 P.2d 282 (1955); *Thomey v. Thomey,* 67 Idaho 393, 181 P.2d 777 (1947); *Lea v. Galbraith,* 64 Idaho 724, 137 P.2d 320 (1943); *Morrison v. Sunshine Mining Co.,* 64 Idaho 6, 127 P.2d 766 (1942); *Nicholas v. Idaho Power Co.,* 63 Idaho 675, 125 P.2d 321 (1942); *Mauldin v. Sunshine Mining Co.,* 61 Idaho 9, 97 P.2d 608 (1939); *Estate of Tormey,* 44 Idaho 299, 256 P. 535 (1927); *Smith v. Smith,* 32 Idaho 478, 185 P. 67 (1919); *Labonte v. Davidson,* 31 Idaho 644, 175 P.

588 (1918); *Huff v. Huff,* 20 Idaho 450, 118 P. 1080 (1911). Most recently in *Metropolitan Life Insurance Co. v. Johnson, supra,* the Court reviewed the doctrine, the element of consent by the parties required for a common-law marriage, and the evidentiary showing necessary for a proponent to raise a presumption that a common-law marriage exists. We stated that "[t]he prior decisions of this Court make clear that when a couple cohabit, assume the rights, duties and responsibilities of marriage, and *hold themselves out as being married,* a presumption of marriage arises which, if disputed, must be overcome by clear and positive evidence." *Metropolitan Life Insurance Co. v. Johnson, supra,* 103 Idaho at 127, 645 P.2d at 361 (emphasis added). While a common-law marriage may be proven by testimony of a party to that relationship, *id.* at 127, 645 P.2d at 361, we have also held that "the existence of such a [common-law] relationship may be negated by evidence that the parties held themselves out as single persons rather than as husband and wife." *Hamby v. J.R. Simplot Co.,* 94 Idaho 794, 796, 498 P.2d 1267, 1269 (1972). We do not perceive these holdings to be inconsistent.

To constitute a marriage under I.C. § 32–201, the parties with contractual capacity must consent and this "must be followed by a solemnization, or by a mutual assumption of marital rights, duties or obligations." In *Metropolitan Life Insurance Co. v. Johnson, supra,* we further examined the element of consent necessary to form a common-law marriage under I.C. § 32–201. We held that

"consent to enter into a common law relationship may be implied and established from the circumstances and facts of the parties' relationship in cohabiting, assuming the rights, duties and obligations of marriage, and *holding out of themselves as husband and wife.*" *Metropolitan Life Insurance Co. v. Johnson, supra,* at 128, at 128, 645 P.2d at 362.

The record here contains conflicting evidence on the "holding out of themselves as husband and wife." *Id.* Evidence

is present that the claimant did not hold herself out as being married to the decedent. At its inception the relationship was not marital. The decedent and claimant lacked the capacity to marry because they were both still married to others. Once these impediments were removed by divorce, the Commission could have found a common-law marriage but such a finding was not inevitable or required as a matter of law. Testimony of several witnesses adequately supports the findings by the Commission that on several occasions during the summer of 1978 the claimant disavowed being married. Other testimony supports a finding that the claimant identified herself as the decedent's "live-in." Nothing in the record shows that before the decedent's death that the claimant ever used the name Mrs. Graham or represented herself as the decedent's wife. The credibility of witnesses and the weight to be accorded the evidence is for the trier of fact. *See In re Gholson's Estate,* 83 Idaho 270, 273, 361 P.2d 791, 793 (1961). Where the findings of the Commission are supported by substantial, competent evidence, the findings will not be disturbed on appeal. *E.g., Curtis v. Shoshone County Sheriff's Office, supra.* The Commission found that the claimant did not hold herself out as married which finding was supported by substantial, competent evidence and supports the ultimate finding that there was no common-law marriage.

Appellants argue that inadmissible evidence as to the issue of the common-law marriage was allowed to be introduced over objection. Testimony was permitted regarding introduction made by a witness of the claimant to another person as "Mrs. Sanborn." It was not established whether this introduction occurred before or after the parties possessed the capacity to marry; therefore, it was irrelevant to the issue of reputation. However, the Industrial Commission is not bound by the strict rules of evidence. *Brooks v. Duncan,* 96 Idaho 579, 532 P.2d 921 (1975). Because the appellants have failed to demonstrate the prejudicial effect of the testimony and there was other evidence on the issue, error if any was harmless. *E.g., Obray v. Mitchell,* 98 Idaho

533, 538, 567 P.2d 1284, 1289 (1977); *see, e.g., Annau v. Schutte,* 96 Idaho 704, 710, 535 P.2d 1095, 1101 (1975).

Appellants contend that testimony regarding statements made by the decedent was inadmissible under our holding in *Morrison v. Sunshine Mining Co.,* 64 Idaho 6, 127 P.2d 766 (1942). This situation is distinguishable from that in *Morrison.* In *Morrison* testimony regarding a third-party's statements with respect to a relationship with a decedent was held inadmissible. Here, the testimony concerned statements by the decedent that he was going to leave the claimant and go back to his ex-wife. The testimony, if a proper foundation was laid, was admissible with respect to the issue of the decedent's consent to be married. Furthermore, even if inadmissible, the appellants have not demonstrated any prejudicial effect. The failure of claimant to prevail on the issue of the existence of the common-law marriage was based upon her failing to hold herself out as married not upon the decedent's failure to so hold. The Commission found as fact that the decedent considered himself married. The Commission will not be reversed because this testimony was not material to the finding that claimant failed to show her consent to be married which was the basis for a finding of no common-law marriage.

The order of the Industrial Commission is affirmed.

No attorney fees allowed.

Costs to respondents.

BAKES, C.J., and McFADDEN and SHEPARD, JJ., concur.

(McFADDEN, J., registered his vote prior to his retirement on August 31, 1982.)

BISTLINE, Justice, dissenting.

Today's decision runs contrary to our unanimous opinion in the recent case of *Metropolitan Life Insurance Co. v. Johnson,* 103 Idaho 122, 645 P.2d 356 (1982) (trial court determination that no common-law marriage existed overturned), which followed a long line of cases, including *In re*

*Foster,* 77 Idaho 26, 287 P.2d 282 (1955) (Commission determination of no common-law marriage set aside as not being supported by substantial evidence), and *Mauldin v. Sunshine Mining Co.,* 61 Idaho 9, 97 P.2d 608 (1939) (Commission determination of no common-law marriage set aside as not being supported by substantial evidence). If it is the obligation of this Court—the end of the line in most civil litigation—to establish uniform standards for determining the circumstances under which a common-law marriage will be found to exist, and most understand that such is so, then this Court should carefully fulfill its case-law making function.

I.

The facts in *Foster* are substantially similar to those in the present case, yet this Court has reached fundamentally different conclusions in the two cases without distinguishing them. In *Foster,* the facts tending to support the existence of a common law marriage were thus: (1) In June of 1951, Foster moved into claimant's home paying $25 per week for food and lodging. (2) On April 9, 1953, claimant accompanied deceased on a trip. They stayed at a motel and registered as Mr. and Mrs. Foster. They decided to get married at a later time. (3) The couple informed his daughter they were to be married. (4) On the trip, they stayed at his sister's house for three days before returning home. (5) En route home, they stayed at a motel and registered as Mr. and Mrs. Foster. Foster introduced claimant to the proprietor as his wife. (6) Claimant testified that she and Foster lived together as husband and wife; that he assumed the position of husband and head of the household, bought the groceries, cut the wood, made repairs and improvements in the house and acted as father and counselor to her boys; that they went to taverns, restaurants, dances and other places together where they acted and were received as husband and wife. (7) Eleven witnesses testified that Foster and claimant held themselves out to the public as husband and wife; that they were received and regarded by their friends and relatives as such; and that they were reputed in the community to

be husband and wife. (9) Foster's sister, brother, and sister-in-law testified that after the trip in April, Foster when invited to stay for a meal said he would have to go "home;" that he had to take his meals at "home;" and that "the missus will be waiting for me." His brother and sister-in-law congratulated the couple after their return, thinking they had been married while away. Such greeting was accepted by Foster without denial. These and others of Foster's relatives accepted claimant into the family as Foster's wife. Opposed to claimant's evidence was testimony that: (1) A witness testified Foster and claimant were not reputed to be husband and wife. He knew "they were together, more or less," but did not know they were living together. (2) A bookkeeper for the employer testified that in July, before Foster's death, when Foster inquired about deductions from his wages, she called attention to the fact that if he claimed some person as a dependent he could reduce the tax deductions, he responded he could not do that because he was not married. She also testified that she heard that Foster and claimant were living together and were not married.

This Court held in *Foster* that:

"[T]he record is that the parties were of good moral character and that their relationship was in no wise illicit or furtive, but was openly and publicly acknowledged as that of husband and wife. The record establishes their relationship as that of persons entirely without impediment, presently consenting to, and consummating a marriage by mutual assumption of marital rights, duties, and obligations, in full compliance with § 32–201 I.C. Their intention of later solemnizing the marriage by a civil ceremony could not operate to defeat the marriage already accomplished. . . .

"'"The presumption of marriage, from a cohabitation, apparently matrimonial, is one of the strongest presumptions known to the law. * * * Where there is enough to create a foundation for the presumption of marriage, it can be repelled only by the most cogent and satisfactory evidence."'" (Citation omitted.)

"Viewed in the light of this presumption, there is a want of substantial evidence to support the order of the board denying compensation to appellant." 77 Idaho at 32–33, 287 P.2d at 285–86.

The facts in the case at bar parallel those in *Foster,* presenting *an even stronger* case for the existence of a common-law marriage: (1) Graham and claimant began living together before their divorces were final. By May 19, 1978, both were divorced from their respective spouses. They continued to live together until Carroll Graham's death. *Claimant's children lived with the couple through this entire period.* (2) A witness testified that before their divorces, claimant and Graham discussed their intent to marry. Claimant testified that in September of 1978, she and Graham had again discussed getting married. (3) A witness testified that claimant and Graham discussed having a log home built. (4) On September 14, 1978, Graham completed a W–4 Form as a married man. Graham was reported as a married man by his employer, the defendant, on the Notice of Injury. (5) Graham designated claimant as beneficiary on his life insurance policy. (6) Claimant testified that at the time of Graham's death she was his wife, that she fulfilled all the duties of a wife toward Graham, and he the duties of a husband toward her, including support of herself and her children. Graham placed his paychecks in their joint checking account. (7) The bank accounts, checking and savings, were opened before May 19, 1978, jointly in the parties' then names, Graham and Sanborn. (8) Claimant paid most of the parties' bills. (9) Graham introduced claimant and referred to her as either "my wife" or "my better half." (10) Shirley Graham, deceased's first wife, testified that she told Carroll that he should have claimant go to work, like she did when they were married. (11) Decedent's children visited Graham at the house he shared with claimant. (12) Several witnesses testified that Graham and claimant were often seen together at logging events, bowling, or eating breakfast at the Chuckwagon Restaurant. (13) Witnesses testified that they assumed that Graham and the claimant were married. (14) When it came time to renew her driver's license, claimant changed her name designation from Sanborn to Graham. Opposed to claimant's evidence was testimony that: (1) The wife of Larry Donohoe (of Larry Donohoe Logging) said claimant called herself "Carroll's live-in" the day after the funeral. Claimant denied making this statement. (Mrs. Donohoe admitted she was inquiring about their workmen's compensation coverage and that she made Graham's final paycheck out to "Margaret Graham.") (2) Shirley Graham testified that Graham began in September of 1978 to say he planned to leave claimant and return to Shirley. Another witness, Kirschner, testified that Graham told him that he was going to leave claimant and go back with Shirley. (4) Kirschner testified that he asked claimant when she and Graham were going to get married and she said, "are you kidding, we don't want to ruin a good thing." (5) Kirschner also testified that at a later time he asked claimant if she and Graham had married yet when she once again stated, "we don't want to ruin a good thing." (6) Claimant did not make the funeral arrangements for deceased. (Claimant testified that she did not because she was informed when learning of Graham's death that the funeral arrangements were already being taken care of.) (7) Another witness testified that though she could not remember the exact wording of the conversation, claimant had said to her that she wasn't married and wasn't going to be, it was the only way to go. (8) Claimant never changed her name from Sanborn to Graham.

In the present case, the Commission based its conclusion that there was no common-law marriage on the predicate that although there were consent and assumption of marital rights by *deceased,* there was some evidence that claimant held herself out as a single person. In *Foster,* this Court balanced evidence that the deceased held himself out as a single person against evidence of the marriage and held that "[its] effect is not sufficient to overcome claimant's proof of marriage." 77 Idaho at 31, 287 P.2d at 285. The same should hold

true in the present case. Although claimant made several statements that they weren't married, the bulk of the evidence shows that claimant presented herself as married and accepted the rights and duties of a married woman. She and her children occupied a house with the decedent. *The Commission specifically found that claimant's children were actually dependent upon Graham.* His income paid most of the family's bills, as she worked only part-time earning an average gross salary of $125 per month. She did his laundry and cooked his meals. They ate breakfast out numerous mornings, either alone or with other married couples, and went to social events together. They bowled together with other married couples in a doubles league and went to logging events together. They enjoyed a general reputation in the community as a married couple. As in *Foster,* the evidence tending to show that claimant held herself out as a single person which evidence was largely self-serving testimony of the employer, is not sufficient to overcome claimant's proof of marriage which was in ample corroboration of the presumption.

## II.

This Court, so recently that the ink is not dry, has just held that:

"[C]lear evidence of cohabitation, of assumption of the rights, duties and responsibilities of marriage and the holding themselves out to the community as husband and wife establish the presumption of marriage, including the element of consent." *Metropolitan Life,* 103 Idaho at 128, 645 P.2d at 362.

This case is governed by the cases of *Metropolitan Life, Foster,* and *Mauldin v. Sunshine Mining Co.,* 61 Idaho 9, 97 P.2d 608 (1939), in which claimant was held to have established a prima facie case of common-law marriage even though there was some evidence that one of the parties had at times denied the marriage—whether to foist off further impertinent inquiry, or in jest, being uncertain.

In *Metropolitan Life,* the decedent, Johnson, designated the claimant as "Lenore Jensen, friend" upon a life insurance change of beneficiary form and excluded the claimant from his will. The claimant, in that case, did not file for letters of administration of Johnson's estate. This Court nonetheless applied the presumption of marriage in the face of this evidence that the parties to the marriage on occasion held themselves out as single persons.

In *Foster,* this Court also applied the presumption of marriage where there was evidence that Foster held himself out as a single person. Foster filed his tax returns as a single person and told his employer's bookkeeper that he was not married. Other testimony was also offered that Foster and claimant did not enjoy a reputation in the community as married persons.

In *Mauldin* this Court applied the presumption in the face of evidence that both parties to the marriage held themselves out as single persons. In that case, there was evidence presented that Mauldin and claimant were not registered as married at the hotel in which they were staying; that Mauldin had stated to an IRS collector that he was a single man; periodical and re-employment records of Mauldin's employer and signed by Mauldin indicated that he was single; that claimant had dated another man while Mauldin was working nights and had been known at times as Laverne Lee; and that Mauldin encouraged claimant to date other men.

In the present case, even though there is some evidence that the claimant may have denied the marriage, it must be remembered that lay people are prone to think of marriage only in terms of that which is ceremonial. Here the great weight of the evidence demonstrated that the parties enjoyed a general reputation in the community as being married and that they almost uniformly held themselves out as married persons. As in the preceding cases, the evidence of common-law marriage is sufficient to call into play the presumption of marriage which can be rebutted only upon a showing of "the most cogent and satisfactory evidence." *Foster,* 77 Idaho at 33, 287 P.2d at 286.

The failure of the Commission to evaluate the evidence presented in light of this

presumption constitutes reversible error. Were it not for the effect of this longstanding and unchallenged presumption, perhaps I might be brought to agree that there was substantial evidence to support the Commission's finding. But the presumption yet lives. The Court may have it in a state of hibernation—but it is still the law and should be followed. That claimant stated that she and the decedent were not married, which could be interpreted as meaning they were not formally married, is not what most lay people of ordinary intellect would recognize as the most cogent and satisfactory of evidence, especially in light of the great weight of evidence that the parties held themselves out to the world as being married and assumed the rights, duties and obligations of married persons.

The evidence that Graham considered leaving claimant to go back with his former wife is not probative. One can leave a wife as well as leave a person one is not married to. Experience teaches that the former is the more likely. The evidence that claimant did not change her name from Sanborn to Graham is also not probative. This Court must recognize the common practice of women retaining their maiden names upon marrying. At oral argument counsel for respondent conceded that in the court system itself and also amongst personnel of the Industrial Commission it is not an unknown phenomenon for women who have *formally* married to continue the use of their surname. Therefore, I would hold that the evidence presented was not sufficient to rebut the presumption of common-law marriage which should have been applied by the Commission and that the Commission's decision was not supported by substantial evidence.

Today's decision, although outwardly affecting merely the rights and financial security of claimant, also affects that of her two children, Gina and Richard Sanborn—a point given scant consideration by the Court's opinion. The Workmen's Compensation Law provides compensation benefits for children, stepchildren, and adopted children of injured or deceased workers. I.C. § 72–410.[1] While the Court may believe itself justified in upholding the Commission's determination that no common-law marriage existed between Carroll and Margaret Graham, the minor claimants Gina and Richard Sanborn are entitled to separate consideration, a point also not considered by the Commission. These children, although not the biological children of Graham in fact lived with him and were dependent upon him for food, clothing and shelter. The Commission, while finding that the children were actually dependent on Graham—their mother earning a gross salary of only $125 per month—denied benefits to all claimants, largely because of several offhand, ambiguous, perhaps flippant but certainly inconsequential statements made by Margaret, all of which are capable of being construed as denying only that a ceremonial marriage had taken place, or which may be considered merely as evasive remarks in response to the inquiry of a busybody.

An injustice for certain worked by today's opinion is that it tars the minor claimants with the brush used on their mother—penalizing them for remarks they played no part in.

In a second respect the Court fails to examine the children's rights independently of those of the mother. The Workmen's Compensation Laws provide compensation for "those persons treated as adopted." I.C. § 72–410(1).[2] It has forever been a policy of the law that children are favorites of the

---

1. I.C. § 72–410 provides: "The following persons, and they only, shall be deemed dependents and entitled to income benefits under the provisions of this act:

   "(1) A child if under eighteen (18) years of age ...."

   "Child" is further defined by I.C. § 72–102(7)(c): "'Child' includes adopted children, posthumous children, and acknowledged illegitimate children, but does not include stepchildren unless actually dependent."

2. An adopted child for purposes of determining eligibility under the Act, *see* footnote 1 *supra,* is defined as: "'Adopted' and 'adoption' include cases where persons are treated as adopted as well as those of legal adoption unless legal adoption is specifically provided." I.C. § 72–102(7)(a).

**832**

courts, and it is encumbent upon the Court to protect those rights, even though a confident Margaret might not have anticipated that it would be this case where the Commission and then the Court would break with precedent.